UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADP, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>JORDAN LYNCH,<br><br>       Defendant. | Civ. No. 2:16-01053 (WJM) |
| ADP, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>JOHN HALPIN,<br><br>       Defendant. | Civ. No. 2:16-01111 (WJM)<br><br>OPINION |

**WILLIAM J. MARTINI, U.S.D.J.:**

    ADP, LLC ("ADP") has accused former employees Jordan Lynch and John Halpin (collectively, "Defendants'"") of violating restrictive covenants contained in certain employment agreements. This matter comes before the Court on motions to dismiss filed by Defendants. In the alternative, Defendants ask that the Court transfer this matter to a different venue. In addition to opposing Defendants' submissions, ADP has filed motions seeking preliminary injunctive relief. For the following reasons, Defendants' motions to dismiss, or alternatively to transfer venue, will be **GRANTED in part and DENIED in part**, and ADP's motions for preliminary injunctive relief will be **GRANTED in part and DENIED in part**.

## I. BACKGROUND

Unless otherwise noted, the following facts are alleged by ADP. ADP is a Delaware LLC with its principal place of business in Roseland, New Jersey. Halpin Complt. at ¶ 2. Lynch is a Colorado resident, while Halpin is a Michigan Resident. Lynch Complt. at ¶ 3; Halpin Complt. at ¶ 3. ADP provides "business outsourcing and software services to clients, including human resources, payroll, tax and benefits administration services. Halpin Complt. at ¶ 6. Lynch was an ADP employee from August 24, 2009 to January 4, 2016. Lynch Complt. at ¶¶ 10, 37. Halpin was an ADP employee from March 30, 2009 to December 23, 2015. Halpin Complt. at ¶¶ 10, 30. This case concerns Defendants' alleged violation of certain restrictive covenants they entered into with ADP. Below are the relevant allegations as to each Defendant.

### A. Lynch

Lynch was initially hired by ADP as an Associate District Manager and eventually climbed the corporate ranks to the position of Up Market District Manager. *See* Lynch Complt. at ¶ 10. In his positions at ADP, "Lynch was responsible for cultivating, developing, and maintaining business with clients and prospective clients in assigned areas." *Id.* at ¶ 11.

Shortly before joining ADP, Lynch entered into a Sales Representative Agreement dated July 2, 2009. *Id.* at 12. In the event Lynch leaves ADP, the Sales Representative Agreement restricts him from engaging in any of the following: (1) soliciting business from certain clients or prospective clients within one year of leaving ADP; (2) disclosing any confidential or proprietary information relating to ADP;[1] and (3) using confidential information concerning the identity of current, former, or prospective clients. *See id.* at ¶¶ 12-15. At around that same time, Lynch also executed a Nondisclosure Agreement. In addition to restricting Lynch's use of company property in the event that his status as an ADP employee terminate, the Nondisclosure Agreement also contains a non-solicitation provision. *See id.* at ¶¶ 16-18. According to ADP, prior to entering into the Nondisclosure Agreement, Lynch had the opportunity to review the agreement's terms with an attorney. *See id.* at ¶ 19.

During the course of his employment with ADP, Lynch agreed to participate in ADP's restricted stock award program (the "Plan"). As a condition of receiving stock awards under the Plan, Lynch entered into a Restrictive Covenant Agreement dated September 22, 2011 (the "2011 Restrictive Covenant"). The 2011 Restrictive Covenant

---

[1] ADP alleges that Lynch received special training and knowledge as an ADP employee. Lynch's status as an ADP employee also allegedly gave him access to confidential ADP material and proprietary information. *See id.* at ¶¶ 30-32. ADP alleges the same against Halpin. *See* Halpin Complt. at ¶ 27.

contained a non-compete provision in which Lynch agreed that for the first year following his termination from ADP, he would not work for an ADP competitor within the geographic territory that he managed. *See id.* at ¶ 21. The 2011 Restrictive Covenant also contained non-disclosure and non-solicitation provisions. *See id.*

Lynch entered into similar agreements under the Plan in 2012 (the "2012 Restrictive Covenant") and 2013 (the "2013 Restrictive Covenant"). *See id.* at ¶ 24. The Restrictive Covenants from 2011 to 2013 were included in documents that were separate from the main stock agreements. However, in order to receive awards under the Plan from 2011 to 2013, Lynch was required to acknowledge a collection of grant documents, which included the Restrictive Covenants. *See* Caban Cert. (Lynch Action) at ¶9. In fact, Lynch was physically unable to click the "Accept Grant" button unless he had affirmatively checked a prior box indicating that he had read all of the associated documents. *See id.* at ¶¶ 11-12.

Lynch then executed similar agreements under the Plan in 2014 (the "2014 Restrictive Covenant") and 2015 (the "2015 Restrictive Covenant"). *See id.* at ¶¶ 27-29. ADP acknowledges that the process for accepting Plan awards in 2014 and 2015 was different from what occurred from 2011 to 2013. *See* Caban Cert. (Lynch Action) at ¶ 14. However, as was the case from 2011 to 2013, Lynch could not receive his 2014 and 2015 awards without assenting to the corresponding restrictive covenants. *See id.*

ADP alleges that Lynch breached the Sales Representative Agreement, Nondisclosure Agreement, and the above-mentioned Restrictive Covenants (collectively, the "Agreements") shortly after he voluntarily left the company in January of 2016. *See* Lynch Complt. at ¶¶ 36-37. Specifically, shortly after he left ADP, Lynch became employed by The Ultimate Software Group, Inc. ("USG"), which provides services that are substantially similar to those provided by ADP. *See id.* at ¶¶ 38-39. In light of Lynch's new employment status, ADP accuses him of violating the non-compete, non-disclosure, and non-solicitation provisions contained in the Agreements. *See id.* at ¶¶ 40-42.

B. Halpin

Halpin began his tenure at ADP as a Major Accounts Sales Trainee. He was eventually promoted to Up Market District Manager in ADP's Major Accounts Division. *See* Halpin Complt. at ¶ 10. While Halpin is not alleged to have entered into the Sales Representative Agreement or Nondisclosure Agreement, he is alleged to have entered into a number of restrictive covenants under the Plan. Specifically, Halpin (like Lynch) entered into the 2011 Restrictive Covenant, the 2012 Restrictive Covenant, the 2013 Restrictive Covenant, the 2014 Restrictive Covenant, and the 2015 Restrictive Covenant. *See id.* at ¶¶ 14-22. Like Lynch, Halpin had to acknowledge that he read the Restrictive Covenants before he could accept his grants under the Plan. Indeed, Lynch and Halpin were required to undergo the same exact steps before receiving their grants. *See* Caban Cert. (Halpin Action) at ¶¶ 9-15.

ADP accuses Halpin of breaching the Restrictive Covenants by joining USG. In particular, ADP alleges that as a USG employee, "Halpin will be responsible for selling the same or substantially similar services as he sold on behalf of ADP in the same geographic area as that which he was responsible for while working at ADP." *See* Halpin Complt. at ¶ 32. Just as it has in its case against Lynch, ADP accuses Halpin of violating the non-compete, non-disclosure, and non-solicitation provisions contained in the Restrictive Covenants. *See id.* at ¶¶ 29-33. Specifically, Halpin is accused of soliciting ADP clients through social media outreach. *See id.* at ¶ 34.

## II. DEFENDANTS' MOTIONS TO DISMISS

Defendants move to dismiss for a lack of personal jurisdiction. In determining whether personal jurisdiction exists, a court will conduct a two-step inquiry. First, it will determine whether the state's long-arm statute provides that personal jurisdiction exists over the defendant. Second, it will determine whether the exercise of personal jurisdiction over the defendant would violate the Due Process Clause of the Fourteenth Amendment. *See, e.g., IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998). The exercise of personal jurisdiction does not violate the Due Process Clause of the Fourteenth Amendment where "the defendant purposefully avails itself of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 417 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235 (1958)).

However, in some cases a defendant may waive its rights concerning personal jurisdiction. *See, e.g., Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). For example, a defendant may waive its personal jurisdiction rights by entering into an agreement containing a forum selection clause that also includes a waiver of objections to personal jurisdiction. *See, e.g., National Equipment Rental, Limited v. Szukhent*, 375 U.S. 311, 316 (1964) ("parties to a contract may agree in advance to submit to the jurisdiction of a given court...."); *Park Inn Intern., L.L.C. v. Moody Enterprises, Inc.*, 105 F.Supp.2d 370, 374 (D.N.J. 2000).

ADP argues that this Court has personal jurisdiction over Defendants by virtue of the jurisdictional clauses contained within the Agreements. For example, one such clause provides that Defendant "agree[s] and consent[s] to the personal jurisdiction and venue of the federal or state courts of New Jersey...." *See* Lynch Complt. at ¶ 26.

In response, Defendants argue that they did not receive adequate notice regarding the terms of the Restrictive Covenants. Accordingly, Defendants contend that the forum selection clauses that ADP cites are unenforceable.

The Court will decide this issue in the following manner. First, the Court will provide the legal standards that govern the enforceability of the type of agreements at issue

in this case. Next, the Court will analyze each jurisdictional provision cited by ADP and then determine whether that particular provision is enforceable.

### i. Governing Law

Under New Jersey law, a contract term is binding only where the contract is mutually agreed upon by the parties. *Hoffman v. Supplements Togo Mgmt.*, 419 N.J.Super. 596, 606 (N.J. Super. Ct. App. Div. 2011) (citing *W. Caldwell v. Caldwell*, 26 N.J. 9, 24-26 (1956)).[2] Mutual assent occurs where there is a meeting of the minds. *Id.* (citing *Pop's Cones, Inc. v. Resorts Int'l Hotel*, 307 N.J.Super. 461, 467-78 (N.J.Super.Ct.App.Div.1998). In other words, "each party to the contract must have been fairly informed of the contract's terms before entering into the agreement." *Id.* The question here is whether Defendants assented to the jurisdictional provisions contained in the Agreements.

### ii. The Sales Representative Agreement and the Nondisclosure Agreement

As mentioned previously, Lynch entered into the Sales Representative Agreement and Nondisclosure Agreement shortly after joining ADP. The Sales Representative Agreement, which Lynch executed, includes a term indicating that the United States District Court for the District of New Jersey shall have jurisdiction over the parties. Therefore, this Court has personal jurisdiction over Lynch with respect to ADP's claims arising out of the Sales Representative Agreement. The Nondisclosure Agreement, however, does not contain any terms providing for personal jurisdiction. Because ADP does not contend that there is an alternative basis for jurisdiction other than the terms contained within the Restrictive Covenants, the Court will **GRANT** Lynch's motion to dismiss the claims arising out of the Nondisclosure Agreement. However, the Court will **DENY** Lynch's motion to dismiss the claims arising out of the Sales Representative Agreement.

### iii. The Restrictive Covenants

The jurisdictional provisions of the Restrictive Covenants are not contained within the actual grant agreements that conferred benefits under the Plan. Instead, they are part of a series of separate documents that ADP presented to Defendants in addition to the main grant agreements. ADP argues that the jurisdictional provisions were incorporated into the main grant agreements by reference and are therefore enforceable.

"In order for there to be a proper and enforceable incorporation by reference of a separate document ... the party to be bound by the terms must have had 'knowledge of and assented to the incorporated terms.'" *Alpert, Goldberg, Butler, Norton & Weiss, P.C., v.*

---

[2] All parties have cited to New Jersey authority in their respective briefs.

*Quinn*, 410 N.J.Super. 510, 533 (N.J.Super.Ct.App.Div.2009) (citing 4 Williston on Contracts § 30:25 (Lord ed. 1999)). Where the drafting party argues that a forum selection clause has been incorporated into the main agreement, it must demonstrate that the non-drafting party received adequate notice of that clause and assented to it. *See Liberty Syndicates at Lloyd's v. Walnut Advisory Corp.*, Civ. No. 09-1343, 2011 WL 5825777, *3 (D.N.J. Nov. 16, 2011).

As explained in the prior section, Defendants were required to acknowledge that they read all documents, including the Restrictive Covenants, before accepting stock grants issued pursuant to the Plan. Therefore, the jurisdictional provisions at issue were part of what other courts have referred to as "clickwrap agreements." A clickwrap agreement requires a computer user to affirmatively manifest her assent to the terms of contract. *See, e.g., Specht v. Netscape Communications Corp.*, 306 F.3d 17, 22 n. 4 (2d Cir. 2002) (clickwrap "presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the [] agreement by clicking on an icon.") (citations omitted). Clickwrap agreements impose that requirement by informing the user that taking such action will comprise her assent to the displayed terms. *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D.Pa. 2007) (clickwraps require that a user "consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction."). If the user does not affirmatively manifest her assent to the terms by taking the required action, she will not be able to proceed and obtain the offered good or service, which in this case was a stock grant. *See Liberty Syndicates at Lloyd's*, 2011 WL 5825777 at *4.

Numerous courts, including courts in the Third Circuit, have enforced clickwrap agreements. *See James v. Global Tel*Link Corp.*, No. 13-4989, 2016 WL 58976 (D.N.J. Feb. 11, 2016) (citing cases). That is because clickwrap agreements that incorporate additional terms by reference will generally provide "reasonable notice" that the additional terms apply. *Cf. Holdbrook Pediatric Dental, LLC v. Pro Computer Service, LLC*, Civ. No. 14-6115, 2015 WL 4476017, *6 (D.N.J. July 21, 2015). Courts have even enforced clickwrap agreements that did not physically require the signatory to actually review the terms before assenting to them. For example, in *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829 (S.D.N.Y. 2012), an online social media service included terms of use that contained a forum selection clause. An individual could not gain access to the service until he or she affirmatively acknowledged reading and agreeing to the service's terms of use. 841 F.Supp.2d at 834. While the terms of use were readily available to the individual, there was no mechanism that forced him or her to actually read them. Consequently, the user could falsely represent that he or she read the terms of use by clicking the acknowledgement box before using the social media service. Despite that feature, the court held that the forum selection clause was enforceable. It noted that by requiring the user to acknowledge the terms and conditions before using the service, while at the same time making those terms and conditions available for review, the social media site adequately alerted the user to the existence of the forum selection clause. *See id.* at 839-842.

6

At this stage in the litigation, the Court finds that the forum selection clauses are encompassed by enforceable clickwrap agreements. The complaints unequivocally allege that an employee could not accept any stock grants until acknowledging that he or she reviewed all grant documents, including the Restrictive Covenants that contained the forum selection clauses. *See, e.g.*, Lynch Complt. at ¶ 27; Halpin Complt. at ¶ 20. *See also Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 (3d Cir. 1992) ("[C]ourts reviewing a motion to dismiss a case for lack of in personam jurisdiction must accept all of the plaintiff's allegations as true and construe disputed factors in favor of the plaintiff.")[3] Similarly, Beatriz Caban, ADP's manager of Stock Plan Services, has provided a step-by-step rundown of how an employee would accept awards under the 2011, 2012, and 2013 grants. In order to accept those awards, an employee would have to affirmatively acknowledge that he or she reviewed the Restrictive Covenants before proceeding. *See, e.g.*, Caban Cert. (Halpin) at ¶¶ 9-13. Ms. Caban similarly indicated that Defendants could not have accepted stock awards in 2014 and 2015 without acknowledging the Restrictive Covenants issued for those years as well. *See id.* at ¶ 14. Therefore, this case involves the type of clickwrap agreement that other courts have found to be enforceable.

Defendants' arguments to the contrary are unavailing. First they argue against enforceability on the grounds that they were not forced to review the Restrictive Covenants at issue. However, that argument was squarely rejected in *Fteja*; and while that decision is not binding here, the Court finds its reasoning persuasive. Other courts have similarly rejected Defendants' position. *See, e.g., 5381 Partners LLC v. ShareaSale.com, Inc.*, Civ. No. 12-4263 (E.D.N.Y. Sept. 23, 2013); *Zaltz v. JDATE*, 952 F.Supp.2d 439, 454 (E.D.N.Y. 2013); *Hubbert v. Dell Corp.*, 359 Ill.App.3d 976, 984 (Ill. App. Ct. 2005). Indeed, to hold otherwise would contravene the well settled principle that "[a]failure to read a contract will not excuse a party who signs it, nor will the party's ignorance of its obligation." *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992).

Second, Defendants argue that mutual assent was lacking because the acknowledgment box did not state "I agree to the terms of the grant documents"; rather, it merely required Defendants to acknowledge that they had "read" those documents before accepting the award. The Court considers this a distinction without difference. In order to receive their stock awards under the Plan, Defendants were required to represent that they had read the Restrictive Covenants. So long as their representation was truthful, they would have reviewed unequivocal language indicating that acceptance of the stock award constituted acceptance of the corresponding Restrictive Covenant. The 2014 Restrictive Covenant, for example, unambiguously conveys that in exchange for good and valuable consideration, the ADP employee agrees to the terms of the Covenant, including the

---

[3] Defendants may be entitled to discovery concerning whether there was mutual assent to the Restrictive Covenants. If that is the case, Defendants may be able to reassert their personal jurisdiction defense at the summary judgment stage. However, the Court currently takes no position with regards to that issue.

provision concerning jurisdiction. *See* Lynch Complt., Ex. F. At least one other district court has reached this conclusion in a case involving similar language. *See Guadagno v. E*Trade Bank*, 592 F.Supp.2d 1263, 1268-71 (C.D.Cal. 2008) (enforcing clickwrap agreement requiring user to acknowledge that she "Reviewed the Agreement....")

Finally, Defendants point to testimony given in a separate proceeding[4] that, in their view, sheds doubt on the validity of the Restrictive Covenants. In general, Defendants argue that the testimony demonstrates the following: the Restrictive Covenants were not mentioned at group sales meetings; ADP did not provide its employees with additional documents concerning the Restrictive Covenants; certain ADP employees did not specifically recall accepting the Restrictive Covenants; Plan administrators did not have discussions with ADP employees regarding the Restrictive Covenants; and Plan administrators did not possess screenshots of individual ADP employees accepting the Restrictive Covenants. *See* Lynch Reply at 2-6.[5] None of this testimony, however, undermines the well-pleaded facts that are currently before this Court. Namely, that ADP required its employees to acknowledge reading all grant documents – including the Restrictive Covenants – before accepting awards under the Plan. Because ADP has sufficiently alleged that it required Defendants to affirmatively accept the Restrictive Covenants (and their jurisdiction provisions), Defendants' motion to dismiss the claims arising out of the Restrictive Covenants is **DENIED.**

### III.  DEFENDANTS' MOTIONS TO TRANSFER VENUE

Alternatively, Defendants seek to transfer this action to a different venue pursuant to 28 U.S.C. § 1404(a). They argue that the forum selection provisions at issue are permissive because they merely indicate that ADP "may" bring an action in this judicial district. Therefore, Defendants contend, the Court should transfer this consolidated action to another venue, notwithstanding the forum selection clauses.

Under 28 U.S.C. § 1404(a), a district court may transfer a case to another district "[f]or the convenience of parties and witnesses, [or] in the interest of justice...." "[A] district court has broad discretionary powers under [Section 1404(a)] to transfer any civil action to any other district where it might have been brought." *Superior Oil v. Andrus*, 656 F.2d 33, 42 (3d Cir. 1981). When exercising its discretion in connection with a Section 1404(a) motion, district courts will generally consider "public" and "private" factors. *See, e.g., Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). Public factors include enforceability of judgment; practical considerations that could make trial easier or more efficient; administrative difficulties; the local interest in deciding controversies at home;

---

[4] *ADP, LLC v. Prossen*, Civ. No. 2:15-06309.

[5] Defendants also suggest that the Restricted Stock Award Agreements do not require recipients to agree to the Restrictive Covenants at issue. This assertion is belied by language expressly indicating that acceptance of awards under the Plan awards is contingent upon the execution of a restrictive covenant. *See* Schmidt Cert., Ex. H.

8

public policy considerations of the fora; and, in diversity cases, the trial judges familiarity with the applicable state law. *See id.* (citing 15 Charles A. Wright, Arthur R. Miller & Edward H Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters § 3848, at 385). Private factors include the plaintiff's forum preference; the defendant's preferences; where the claim arose; the relative convenience to each party; the location of books and records; and, to some extent; the convenience of the witnesses. *See id.*

In *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*, 134 S.Ct. 568 (2013), the Supreme Court explained how courts are to conduct the above-described analysis where the operative agreement includes a forum selection clause. The Court held that the existence of a valid forum selection clause should play a prominent role in a court's Section 1404(a) analysis. Where a plaintiff files a lawsuit in a district that differs from what is specified in a forum selection clause, the plaintiff's choice of forum is disregarded; the private interests are automatically considered to favor the contractually agreed upon forum; and the original venue's choice of law rules do not apply. As a result, cases in which a court refuses to enforce a valid forum selection clause will be exceedingly rare. 134 S.Ct. at 581-83.

Defendants argue that *Atlantic Marine* is of little relevance because this case involves only permissive forum-selection clauses. Accordingly, Defendants argue that the traditional Section 1404(a) analysis applies, and under that analysis, the actions should be transferred.

The Court will deny Defendants' motion to transfer. Even if *Atlantic Marine* does not apply with full force to permissive forum selection clauses, the rationale supporting the Supreme Court's decision is persuasive here. *See, e.g., ADP v. Uminderjit Bakshi*, Civ. No. 15-8385, 2016 WL 1223557, at *3-*4 (D.N.J. Mar. 29, 2016); *Asphalt Paving Sys. v. Gannon*, Civ. No. 14-5518, 2015 WL 3648739, at *3 (D.N.J. June 11, 2015); *ADP LLC v. Chase Admundson*, Civ. No. 15-8951, ECF No. 12-1.[6] That is because even under a traditional 1404(a) analysis, the plaintiff's choice of forum should seldom be disturbed. *See, e.g., Yang v. Odom*, 409 F.Supp.2d 599, 604 (D.N.J. 2006) (citing *Jumara*, 55 F.3d at 879). The parties expressly agreed that disputes arising out of the Restrictive Covenants could be brought in this Court. Pursuant to that agreed upon term, ADP understandably filed its suit in New Jersey, which is its home state. Therefore, it would serve the interests of justice to honor the parties' contractual commitments by keeping the case in this district. *Cf.* 28 U.S.C. § 1404(a). Moreover, other factors favor keeping this dispute in New Jersey. For example, ADP is a New Jersey corporation that has allegedly been injured as a result of Defendants' breach of contract, which means that New Jersey has an interest in the dispute. *See Park Inn Intern., L.L.C. v. Moody Enterprises, Inc.*, 105 F.Supp.2d 370, 378 (D.N.J. 2000). This Court will also apply New Jersey law pursuant to the choice of law

---

[6] The Court acknowledges that other judges have held that a typical Section 1404(a) analysis applies when a forum selection clause is merely permissive. *See, e.g., Netwold Communications Corp. v. Croatia Airlines, D.D.*, Civ.No. 13-4770, 2014 WL 4724625, at *2 (D.N.J. Sept. 23, 2014) (citing cases)

provisions that govern the Restrictive Covenants. *See, e.g., Heartland Payment Systems, Inc. v. Steves*, Civ. No. 15-3544, 2015 WL 7737344, *5 (D.N.J. Dec. 1, 2015). Therefore, even if other factors arguably favor transfer, ADP's chosen forum (which is the same forum contractually agreed upon by the parties) will not be disturbed. Defendants' motion to transfer is **DENIED**.

## IV.   ADP'S REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

A preliminary injunction is an extraordinary remedy that is not routinely granted. *See, e.g., Groupe SEB USA v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014); *Hoxworth v. Blinder, Robinson Co. Inc.*, 903 F.2d 186, 189 (3d Cir. 1990) (the preliminary injunction remedy "must be reserved for extraordinary circumstances...."). Moreover, "the decision to grant or deny a preliminary injunction is committed to the sound discretion of the district court." *U.S. v. Price*, 688 F.2d 204, 2010 (3d Cir. 1982). In order to obtain the extraordinary remedy of a preliminary injunction, Plaintiffs must show (1) they are likely to succeed on the merits; (2) denial will cause them irreparable harm; (3) granting the injunction will not result in irreparable harm to Defendants; and (4) granting the injunction is in the public interest. *Nutrasweet Co. v. Vit-Mar Enterprises*, 176 F.3d 151, 153 (3d Cir. 1999). "The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (citations omitted).

### A. Likelihood of Success on the Merits

With one notable exception, ADP has demonstrated likelihood of success on the merits. Defendants do not deny that they have breached the Agreements by becoming employed with USG. *See, e.g., Barmasters Bartending School, Inc. v. Authentic Bartending School, Inc.*, 931 F.Supp. 377, 385 (E.D.Pa. 1996) (likelihood of success established where defendant undeniably breached restrictive covenant). Instead, they offer theories for why the relevant portions of the Agreements are unenforceable.

First, Defendants argue that the Restrictive Covenants are unenforceable because ADP surreptitiously slipped them into the Plan without providing adequate notice of their existence. However, the Court has already rejected that same argument when it was made in Defendants' motion to dismiss. As already explained, the Restrictive Covenants are part of enforceable clickwrap agreements that provided Defendants with adequate notice of all relevant terms.

Second, Defendants appear to argue that the restrictive covenants contained within the Agreements are overly broad and therefore cannot be enforced as written. The Court concludes that this argument has some merit, at least at the preliminary injunction stage. Under New Jersey law, a restrictive covenant will be enforceable "where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and

is not injurious to the public." *Solari Industries, Inc. v. Malady*, 55 N.J. 571, 576 (1970). Thus, New Jersey courts "recognize as legitimate the employer's interest in protecting trade secrets, confidential information, and customer relations." *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 628 (1988). Moreover, employers may have a legitimate interest in protecting material that is not a trade secret or proprietary, but involves "highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which [an] employee has been 'exposed' and 'enriched' solely due to his employment." *Id.* at 638. However, a restrictive covenant will not be enforced "merely to aid the employer in extinguishing the competition...." *See id.* at 635. In sum, a court evaluating a restrictive covenant must balance "the employer's need for protection and the hardship on the employee that may result." *Id.* at 639.

In *ADP, LLC v. Jacobs*, Civ. No.15-3710, 2015 WL 4670805, (D.N.J. Aug. 5, 2015), the district court assessed the enforceability of the same restrictive covenants that are at issue in this case. The court concluded that the restrictive covenants were enforceable, save for the provisions that prohibited the defendant from soliciting prospective clients of which the defendant did not gain knowledge of through his past employment with ADP. *See Jacobs*, 2015 WL 4670805, *5. In doing so, the court cited to state court decisions questioning the enforceability of restrictive covenants that cover prospective customers. *See id.* (citing *Platinum Mgmt., Inc. v. Dahms*, 285 N.J.Super. 274, 298 (Ch. Div. 1995)). The Court finds this portion of *Jacobs* persuasive. Defendants cannot be restrained from soliciting prospective ADP clients that they had no knowledge of during their time at ADP. If the Court were to hold otherwise, it would deter Defendants from interacting with almost all potential clients for fear that they may be unwittingly violating restrictive covenants they entered into with ADP. Even after considering ADP's interest in upholding the prospective client provisions contained in the Agreements, the Court concludes that those provisions place an unreasonable burden on Defendants' business activities. *See, e.g., Campbell Soup Co. v. Desatnick*, 58 F.Supp.2d 477, 489 (D.N.J. 1999) ("To minimize the hardship imposed on the employee, the geographic, temporal and subject-matter restrictions of an otherwise enforceable agreement not to compete will be enforced only to the extent reasonably necessary to protect the employer's legitimate business interests.") (citing *Coskey's Television & Radio Sales and service, Inc. v. Fote*, 253 N.J.Super. 626, 634 (App. Div. 1992)). To the extent ADP wishes to enjoin Defendants from soliciting prospective clients of which they gained no knowledge of while at ADP, the motion for a preliminary injunction will be denied. However, ADP will likely succeed in demonstrating that the remainder of the restrictive covenants at issue are enforceable.[7]

---

[7] Defendants also appear to suggest that the non-solicitation provisions are unenforceable because they do not contain geographic limitations. However, where a restrictive covenant "seeks to protect an established clientele," rather than prohibit competition altogether, the absence of a geographic limitation does not render the covenant unenforceable. *See Mailman, Ross, Toyes & Shapiro v. Edelson*, 183 N.J.Super 434, 442 (Ch. Div. 1982).

11

*B. Irreparable Harm*

Having demonstrated that the Agreements are, for the most part, likely to be found enforceable, ADP must now show that it will suffer irreparable harm in the absence of an injunction. Specifically, ADP must make "a clear showing of immediate irreparable injury." *See Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205 (3d Cir. 1990) (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 225 (3d Cir. 1987)). Through their motion, ADP seeks to enjoin Defendants from the following: (1) working for an ADP competitor, including USG, within a defined territory; (2) soliciting business from any ADP client or prospective client within a twelve month period; (3) soliciting any ADP employee within a twelve month period; (4) using or disclosing any of ADP's confidential, proprietary or trade secret business information; (5) interfering with any current contract or client relationship; and (6) breaching any duty of loyalty obligation to ADP. Additionally, ADP requests that Defendants return all ADP property and refrain from destroying any documents or other evidence that may be relevant to this litigation.

According to ADP, both Defendants have at least indirectly assisted USG with the solicitation of ADP clients. ADP even goes so far as to say that Halpin has directly solicited a former ADP client while at USG. "Generally, the loss of goodwill, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm." *See Laidlaw, Inc. v. Student Transp. Of America, Inc.*, 20 F.Supp.2d 727, 767 (D.N.J. 1998) (citations omitted). Defendants admit to working for one of ADP's competitors. Thus, there is an imminent risk of Defendants soliciting former ADP clients,[8] if they have not done so already. Indeed, ADP has offered evidence indicating that Defendants have reached out to entities they learned of while they were employed with ADP. *See Jacobs*, 2015 WL 4670805, *7. Moreover, if Defendants are successful in soliciting those clients, ADP would suffer irreparable harm. *See, e.g., Healthcare Services Group, Inc. v. Fay*, 597 Fed.Appx. 102, 104 (3d Cir. 2015) (irreparable harm may exist where former employee solicits clients in violation of restrictive covenant). Consequently, Defendants will be enjoined from soliciting ADP clients, including prospective clients that Defendants gained knowledge of while working at ADP.

Further, ADP accuses Defendants of, at the very least, indirectly assisting USG's solicitation of other ADP clients. Specifically, Halpin and Lynch have allegedly supplied USG with ADP's confidential and proprietary information regarding those clients. Given Defendants' current employment status, there is an imminent threat that ADP's proprietary information will be disclosed to USG. Because such disclosure would inflict irreparable harm on ADP, Defendants will be enjoined from using or disclosing ADP's proprietary information. Moreover, to the extent Defendants are still in possession of physical

---

[8] This would include prospective ADP clients that Defendants gained knowledge of while working for ADP.

materials containing such information, they will be ordered to return it to ADP immediately.

However, the Court will not enjoin Defendants from working at USG altogether. *See Jacobs*, 2015 WL 4670805, at *7. While the solicitation of clients and use of proprietary information will cause irreparable harm to ADP, the mere fact of Defendants working for a competitor, standing on its own, does not warrant the extraordinary remedy of a preliminary injunction.

C. *Balance of Interests*

The balance of interests supports the Court's decision to enjoin Defendants from soliciting ADP clients and/or using ADP's proprietary information. After reviewing ADP's motion, the Court has decided to take a middle road approach: Defendants will be enjoined from taking action that will cause irreparable harm to ADP, but they will not be prohibited from earning a livelihood while this litigation is pending. *See, e.g., Bimbo Bakeries USA v. Botticella*, 613 F.3d 102, 119 (3d Cir. 2010) ("even a temporary injunction prohibiting someone from pursuing his livelihood in the manner he chooses operates as a severe restriction on him that a court should not impose lightly.") After considering the respective interests of each party, the Court believes that it has struck the appropriate balance

D.   *The Public Interest*

"Judicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." *Wright Medical Technology, Inc. v. Somers*, 37 F.Supp.2d 673, 684 (D.N.J. 1999) (citing *AmeriGas Propane, Inc. v. Crook*, 844 F.Supp. 379, 390 (M.D.Tenn. 1993)). That said, there is a public interest in a fluid and dynamic labor market that allows individuals the freedom to choose where they work. *See Bimbo Bakeries USA*, 613 F.3d at 119. The Court has therefore struck the appropriate balance by allowing Defendants to continue their employment at USG, but prohibiting them from taking action that would result in direct and irreparable harm to ADP.

## V. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss, or alternatively to transfer venue, are **GRANTED in part and DENIED in part**. ADP's motions for preliminary injunctive relief are **GRANTED in part and DENIED in part**. An appropriate order accompanies this decision.

/s/ WILLIAM J. MARTINI, U.S.D.J.

Date: June 30, 2016