## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ADP, LLC,** | Civ. No. 2:16-01053 |
| **Plaintiff,** | |
| v. | |
| **JORDAN LYNCH,** | |
| **Defendant.** | |

| | |
|---|---|
| **ADP, LLC,** | Civ. No. 2:16-01111 |
| **Plaintiff,** | |
| v. | **OPINION** |
| **JOHN HALPIN,** | |
| **Defendant.** | |

### WILLIAM J. MARTINI, U.S.D.J.:

This is a case about two sales representatives—Jordan Lynch and John Halpin—who signed several agreements with their employer that restricted their actions should they leave for a competitor. When both nonetheless jumped ship, their former employer sued. The lynchpin of this case is the enforceability of these agreements.

Before the Court are four cross-motions for summary judgment, ECF Nos. [148], [149], [150], & [151] ("Motions"), filed by Plaintiff ADP, LLC ("ADP") and Defendants Lynch and Halpin ("Defendants"). There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, the Motions be **GRANTED IN PART, DENIED IN PART,** and set for **EVIDENTIARY HEARING IN PART.** The counterclaims are set for **JURY TRIAL.**

### I.      FACTUAL BACKGROUND

#### A. DEFENDANTS' WORK AT ADP

The following facts are undisputed unless otherwise stated. Plaintiff ADP is a human capital management company which sells, among other things, human resources

solutions to manage payroll, productivity, tax filings, and benefits offerings. *See* ECF Nos. [150-2], [154-1] ¶¶ 2, 11; [151-2], [155-1] ¶ 1. Plaintiff employed Defendants as sales representatives from August 2009 to January 2016 and March 2009 to December 2015, respectively. ECF Nos. [148-1], [156-9] ¶ 1; [150-2], [154-1] ¶ 1; [149-1], [157-16] ¶ 1; [151-2], [155-1] ¶ 1. Initially, Lynch sold ADP products to small businesses in Fort Collins, Colorado, ECF Nos. [148-1], [156-9] ¶ 2; [150-2], [154-1] ¶¶ 3–4, and Halpin sold ADP products to small businesses in Detroit, Michigan. ECF Nos. [149-1], [157-16] ¶¶ 2–3; [151-2], [155-1] ¶ 2. Defendants were eventually promoted where they sold to companies with between 150 and 999 employees in parts of Colorado (for Lynch) and parts of Michigan (for Halpin). ECF Nos. [148-1], [156-9] ¶¶ 2–5; [150-2] [154-1] ¶¶ 4–8, 10; [149-1], [157-16] ¶ 3; [151-2], [155-1] ¶¶ 5-9, 11–13.

ADP assigned each Defendant a list of approximately 200 potential clients which was maintained in a database. ECF Nos. [148-1], [156-9] ¶ 8; [149-1], [157-16] ¶ 5. These clients were generally located in specific zip codes which comprised Defendants' primary sales area, although the record is not clear which zip codes were assigned to each Defendant. *Cf.* ECF Nos. ECF No. [1-1] ¶ 1; [26-3] ¶ (A)(i); [148-2] at 3; [149-2] at 4; [151-3] at 2–3; [155] at 17-21; [159] a 5, 7. Defendants could sell to prospects outside their area or to larger companies based on their own legwork, collaboration with other representatives, or direction of management. ECF Nos. [148-1], [156-9] ¶ 31, 36; [150-2], [154-1] ¶¶ 10, 30; [149-1], [157-16] ¶¶ 30, 40; [151-2], [155-1] ¶ 9, 33.

Both Defendants were successful at ADP. ECF Nos. [149-1], [157-16] ¶15-17, 24; [148-1], [156-9] ¶ 17, 36; [148-4], Turman Tr. at 45. They were admitted to the "Million Dollar Performer Club," a distinction for particularly high performing representatives; were invited to trainings geared towards top employees; and participated in strategic meetings with senior executives. ECF Nos. [149-6], Wohlfeil Tr. at 105; [148-4], Turman Tr. at 40. Both had access to non-public information such ADP's price book and their client lists, although neither was informed this information was "confidential." ECF Nos. [148-1], [156-9] ¶¶ 8, 13; [150-2], [154-1] ¶ 12; [149-1], [157-16] ¶ 5–8, 12–13; [151-2], [155-1] ¶ 14; [148-4], Lynch Tr. at 32–33; [149-4], Halpin Tr. at 48–49. They did not have access to ADP's entire database of current and prospective clients. *Id.*

During their tenure at ADP, Defendants signed several employment contracts which form the basis of the instant dispute and which can be divided into two "layers." *ADP, LLC v. Rafferty*, 923 F.3d 113, 116 (3d Cir. 2019); ECF Nos. [148-1], [156-9] ¶¶ 14–15; [150-2], [154-1] ¶¶ 13–14; [149-1], [157-16] ¶ 21; [151-2], [155-1] ¶ 17. As to the first layer, Defendants signed two agreements: a Sales Representative Agreement ("SRA") and a Non-Disclosure Agreement ("NDA").[1] ECF Nos. [148-1], [156-9] ¶ 14; [150-2], [154-1] ¶ 15; ECF Nos. [149-1], [157-16] ¶ 21, [151-2], [155-1] ¶ 17. Under the SRA, each agreed that for one year from the end of his employment ("Termination Date"), he would not solicit or contact any a client, *bona fide* prospective client, or marketing partner of ADP what was located in his assigned sales territory for the last two years. ECF No. [150-1], Lynch Tr.,

---

[1] The Court dismissed claims related to the NDA for lack of jurisdiction. *See* ECF No. [31].

Ex. 5; [149-4], Halpin Dep. at 59–61.   The SRA further prohibited Defendants from disclosing, *inter alia*, confidential and proprietary information.  *Id.*

The second layer only affected ADP sales representatives who meet or exceeded their sales targets.  ECF Nos. [148-1], [156-9] ¶ 17; [150-2], [154-1] ¶¶ 19, 21; [149-1], [157-16] ¶¶ 15–16; [151-2], [155-1] ¶ 15.   Those representatives were eligible for additional restricted stock compensation, subject to the acceptance of more restrictive non-compete, non-solicitation, and non-disclosure agreements set forth in a Restrictive Covenant Agreement ("RCA").  ECF Nos. [148-1], [156-9] ¶¶ 17–18, 21, 23–26; [149-1], [157-16] ¶¶ 15–16.  More specifically, under the RCAs Defendants agreed that for one year they would not, among other things, be employed by a "Competing Business" in their former sales territory providing substantially the same services as he provided to ADP; solicit any current or prospective ADP clients, business partners, or employees, regardless of Defendants' contact or knowledge of these entities.  The RCA also contained a non-time limited non-disclosure provision, and in the event of a breach an attorneys' fees provision and a tolling provision of the one-year time limitations.  ECF Nos. [149-4] at 59–64 [148-4] at 73–77.  Defendants testified they were unaware of the restrictive covenants found in the RCAs, but it is undisputed that Lynch signed RCAs each year from 2011 to 2015 and Halpin signed the RCAs each year from 2012 to 2015.  ECF Nos. [148-1], [156-9] ¶¶ 22, 30; [150-2], [154-1] ¶¶ 23, 27; [149-1], [157-16] ¶ 20; [151-2], [155-1] ¶ 25.

On December 23, 2015, Halpin resigned from ADP, and on January 4, 2016, Lynch resigned.  Both had their cell phones wiped of ADP data, and both turned in their ADP computers and other ADP materials.  ECF Nos. [148-1], [156-9] ¶¶ 41, 44; [150-2], [154-1] ¶¶ 9, 28; [149-1], [157-16] ¶ 29; [151-2], [155-1] ¶ 29-30.  There is no evidence in the record that Defendants took any ADP documents or client lists when they left.  ECF Nos. [149-1], [157-16] ¶ 29; [151-2], [155-1] ¶ 29-30.

## B. DEFENDANTS' WORK AT ULTIMATE SOFTWARE GROUP

Defendants began work at Ultimate Software Group ("USG"), a direct competitor of ADP, the day after their resignations.  ECF Nos. [148-1], [156-9] ¶ 41; [150-2], [154-1] ¶¶ 9, 28; [149-1], [157-16] ¶ 29; [151-2], [155-1] ¶ 17.  At USG, Lynch was assigned a client list comprised of companies with 200-500 employees in Colorado and Utah.  ECF Nos. [148-1], [156-9] ¶¶ 41; [150-2], [154-1] ¶¶ 29–30.  Halpin, in turn, was assigned to call on prospective clients with 500-1,500 employees in Michigan.  ECF Nos. [149-1], [157-16] ¶ 30; [151-2], [155-1] ¶¶ 32–33.  The parties agree that there was some overlap between their ADP and USG territories.  ECF Nos. [150-2], [154-1] ¶ 31.

### a. Lynch's Contacts

ADP has directed the Court to the following contacts which it maintains demonstrate violations of the restrictive covenants:

1. **RE/MAX.**  Lynch sold USG products to former ADP client RE/MAX.  ECF Nos. [148-1], [156-9] ¶ 47; [150-2], [154-1] ¶ 32.  Lynch testified that he had not learned of or called on RE/MAX while at ADP.  *Id.*

3

2. **Corden Pharmaceuticals.** Lynch sold USG products to former ADP client Corden Pharmaceuticals. ECF Nos. [148-1], [156-9] ¶ 47; [150-2], [154-1] ¶ 32. Lynch testified that he had not learned of or called on Corden Pharmaceuticals while at ADP. ECF No. [148-1] ¶ 47.

3. **Frasier Meadows.** At USG Lynch had some contact with former ADP client Frasier Meadows. Lynch testified that he had no contact with Frasier prior the injunction, but an email demonstrates he so at least once while at USG. ECF No. [148-4], Lynch Tr. at 157–58, & [150], Ex. A, Lynch Tr. Ex. 28 (under seal). The account was handled by another USG employee who ultimately sold it USG products. ECF Nos. [150-2], [154-1] ¶ 37–38.

4. **Jonah Energy.** Lynch worked on the Jonah Energy account while at ADP. ECF Nos. [150-2], [154-1] ¶ 36. Lynch reached out to Jonah Energy while at USG. *Id.*; *see also* ECF No. [150], Lynch Tr., Ex. 38.

5. **Libertyfrac.** Lynch solicited of potential ADP client Libertyfrac while at ADP but did not close the sale. ECF Nos. [150-2], [154-1] ¶ 36. Lynch later sold Libertyfrac USG products. *Id.*

6. **IMA.** Lynch emailed ADP marketing partner IMA to inform his contact there that he had moved to USG. ECF Nos. [150-2], [154-1] ¶¶ 34–35. According to Lynch, the IMA contact was a personal friend. ECF No. [154-1] ¶ 35. Although Lynch maintains that he did not "solicit IMA or ma[k]e any sales call[s] on" it, ECF Nos. [150-2], [154-1] ¶¶ 34–35, the email states: "Effective the first of the year I have changed positions and now am working with [USG]. I am confident that this change will enable met to continue to be a resource to IMA but without the poor service of ADP :). Let me know if you would be available for a brief coffee next week or the following to catch up." ECF No. [150], Lynch Tr. Ex. 15. At USG, Lynch did not receive any referrals from IMA. ECF Nos. [150-2], [154-1] ¶¶ 34–35.

7. **ADP Employee Dan Hobaica.** Lynch mentioned now-former ADP employee Dan Hobaica to USG as an individual that it could consider for a position at USG's Arizona office. ECF Nos. [150-1], Lynch Tr. at 124; [150-2] ¶ 39–41. Hobaica subsequently left ADP for USG. *Id.*

   **b. Halpin's Contacts**

ADP has directed the Court to the following contacts which it maintains demonstrate violations of the restrictive covenants:

1. **Horizon Global.** Halpin sold USG products to former ADP client Horizon. ECF Nos. ECF Nos. [149-1], [157-16] ¶¶ 39-42; [151-2], [155-1] ¶¶ 41–42. While Halpin avers in one certification that "[w]hile employed at ADP, I never heard of Horizon Global and was never assigned to solicit its business," Halpin also states that he worked on the Horizon Global account while at

ADP and received a 25% commission on the sale. ECF Nos. [149-1], [157-16] ¶¶ 42-43; [151-2], [155-1] ¶¶ 47–49; [149-5], Halpin Cert., Ex. 5, ¶ 5.

2. **Alta.** Halpin contacted prospective ADP client Alta while at USG. ECF Nos. [149-1], [157-16] ¶ 48. ADP concedes that it has "not offered any proofs that Halpin had contact with . . . Alta when he was employed by ADP" in its Responsive Statement of Material Facts; however, Halpin admits he contacted Alta while at ADP. *Cf.* ECF Nos. [149-1], [157-16] ¶ 48 *with* ¶ 49.

3. **McNaughten McKay.** At USG, Halpin contacted prospective ADP client McNaughten. ECF Nos. [149-1], [157-16] ¶¶ 50–52; [151-2], [155-1] ¶ 44. Halpin learned of McNaughten while at ADP. ECF No. [149-1], [157-16] ¶ 52; [151-2], [155-1] ¶¶ 44–45; [149-5], Halpin Cert., Ex. 5, ¶ 3.

4. **Motus.** Halpin sold USG products to former ADP client Motus. ECF Nos. [149-1], [157-16] ¶¶ 39–42; [151-2], [155-1] ¶¶ 41–42. Halpin testified he had no contact with Motus while at ADP, and ADP does not point the Court to facts to the contrary. *Id.*; *see also* [149-5], Halpin Cert., Ex. 5, ¶ 9.

5. **United Shore Financial.** At USG, Halpin participated in meetings with former ADP client United Shore. ECF Nos. [149-1], [157-16] ¶¶ 50–53. United Shore eventually switched from ADP to USG, although Halpin was not the primary representative on the sale. *Id.* The parties do not point the Court to facts that demonstrate Halpin learned of the client at ADP. *Id.*

6. **Hastings Mutual.** Halpin sold USG products to ADP client Hastings. ECF Nos. [151-2], [155-1] ¶¶ 54–55. Halpin testified he had no contact with Hastings at ADP, and ADP does not point the Court to facts to the contrary. ECF Nos. [149-1], [157-16] ¶ 41; [155-1] ¶ 54.

7. **Plasan Carbon.** Halpin contacted ADP client Plasan while at USG. ECF Nos. [151-2], [155-1] ¶¶ 56–59. Halpin testified he had no contact with Plasan at ADP, and ADP does not point the Court to facts to the contrary. *Id.*

8. **Padnos.** Halpin contacted ADP client Padnos while at USG. ECF Nos. [151-2], [155-1] ¶¶ 60–61. Halpin testified he no contact with Padnos at ADP, and ADP does not point the Court to facts to the contrary. *Id.*

9. **Shinola.** Halpin contacted ADP client Shinola while at USG. ECF Nos. [151-2], [155-1] ¶¶ 62–63. Halpin testified he had no contact with Shinola at ADP, and ADP does not point the Court to facts to the contrary. *Id.*

10. **Asahi Kasei Plastics.** Halpin contacted ADP client Asahi while at USG. ECF Nos. [151-2], [155-1] ¶¶ 64–67. Halpin testified he had no contact with Asahi at ADP, and ADP does not point the Court to facts to the contrary. *Id.*

11. **Work Skills.** Halpin contacted ADP client Work Skills while at USG. ECF Nos. [151-2], [155-1] ¶¶ 68–69. The parties do not point the Court to facts that demonstrate Halpin learned of the client at ADP. *Id.*

12. **Barfly Ventures.** At USG, Halpin contacted ADP client Barfly Ventures. ECF Nos. [151-2], [155-1] ¶¶ 68–69. The parties do not point the Court to facts that demonstrate Halpin learned of the client at ADP. *Id.*

13. **Kuka.** Halpin sold USG products to prospective ADP client Kuka. ECF Nos. [149-1], [157-16] ¶ 44; [151-2], [155-1] ¶ 46. Halpin stated he had no contact with Kuka at ADP, and ADP does not point the Court to facts to the contrary. ECF No. [149-1] ¶ 49.

14. **Oakland Management.** Halpin contacted prospective ADP client Oakland while at USG. ECF Nos. ECF Nos. [149-1], [157-16] ¶ 45. Halpin stated he had no contact with Oakland at ADP, and ADP does not point the Court to facts to the contrary. ECF No. [149-1], [157-16] ¶¶ 45, 49.

15. **Village Green.** Halpin contacted prospective ADP client Village Green while at USG. ECF Nos. [149-1], [157-16] ¶ 46. Halpin stated he had no contact with Village Green at ADP, and ADP does not point the Court to facts to the contrary. ECF No. [149-1], [157-16] ¶¶ 46, 49.

16. **Dickenson.** Halpin contacted prospective ADP client Dickenson while at USG. ECF Nos. [149-1], [157-16] ¶¶ 47, 49. Halpin stated he had no contact with Dickenson at ADP, and ADP does not point the Court to facts to the contrary. *Id.*

17. **Little River Casino Resort.** At USG, Halpin contacted prospective ADP client Little River. ECF Nos. [149-1], [157-16] ¶¶ 50, 53–54. Halpin stated he had no contact with Little River at ADP, and ADP does not point the Court to facts to the contrary. *Id.*; [149-5], Halpin Cert., Exs. 4 & 5.

18. **HR Vision IT.** At USG, Halpin contacted ADP prospective client HR Vision. ECF Nos. [149-1], [157-16] ¶ 59–60. Halpin stated he had no contact with HR Vision while at ADP, and ADP does not point the Court to facts to the contrary. *Id.*; [149-5], Halpin Cert., Ex. 5, ¶ 7.

19. **NGK Spark Plug.** At USG, Halpin contacted ADP client NGK. ECF Nos. [149-1], [157-16] ¶ 55–56; [151-2], [155-1] ¶ 43; [149-4], Halpin Tr. at 168–69. Halpin stated he had no contact with NGK at ADP, and ADP does not point the Court to facts to the contrary. *Id.*; [149-5], Halpin Cert., Ex. 5, ¶ 8.

20. **PACE.** Although Halpin states never heard of nor contacted PACE at ADP, and ADP concedes this fact, ECF Nos. [149-1], [157-16] ¶ 55–56; [149-5], Halpin Cert., Ex. 5, ¶ 6, Halpin also testified that he "learn[ed] about PACE when [he] w[as] employed at ADP" but it was "not fully" his prospect. ECF No. [149-4], Lynch Tr. at 209–10. ADP's corporate representative Matthew Wohlfeil testified the PACE sales "lead" was passed to Halpin in 2015. ECF No. [149-6], Wohlfeil Tr. at 144–45. However, Halpin stated he had no contact with PACE at USG, ECF No. [149-4], Lynch Tr. at 210, and ADP does not point the Court to facts to the contrary.

### C. THE COUNTERCLAIMS

#### a. Lynch's Counterclaims for Unpaid Commissions

Lynch states he is owed a $28,888.00 commission for a sale to Beau Jo's that he closed on April 15, 2015 but which did not implement ADP's products until February 2016. ECF Nos. [148-1], [156-9] ¶¶ 51–53; [150-2], [154-1] ¶¶ 48–49, 54–55. Under ADP's Sales Compensation Plan, if an account does not implement within thirty-three weeks, the representative loses the commission on the sale. ECF Nos. [148-1], [156-9] ¶ 52; [150-2], [154-1] ¶¶ 50–53. If the client later does implement after that period, ADP will re-credit the commission to the representative. *Id.*; ECF No. [157-2], Exs. B & C (under seal). Lynch accordingly argues that he is due this "re-credit."

ADP maintains that Lynch is not owed the Beau Jo's commission because the account needed additional sales work after Lynch left, and thus the commission was awarded to another representative. ECF Nos. [148-1], [156-9] ¶¶ 53–56; [150-2], [154-1] ¶ 53. Lynch argues that there is no evidence of this in the record beyond ADP's own affidavits, and further points to the the accounting of his commissions generated by ADP which states that the commission was not credited due to "D[istrict] [M]anager Change," not additional sales work. *Id.*

#### b. Halpin's Counterclaims for Unpaid Commissions

Similarly, Halpin maintains that he is owed $138,000.00 based on a 20% commission rate for new sales to three clients and implementation commissions to six clients. ECF Nos. [149-1], [157-16] ¶ 61; [151-2], [155-1] ¶ 70. ADP disputes whether Halpin is owed the commissions at all as well as his calculations. After Halpin resigned, ADP maintains it performed an audit pursuant to the Sales Incentive Compensation Policy which found that "no starts"—that is, sales where the company never implemented—reduced Halpin's commissions such that Halpin *owes* ADP $7,439.44. ECF Nos. [157-16] ¶¶ 62, 69; [157-2], Ex. C (under seal). ADP produced an internal spreadsheet demonstrating these figures. ECF No. [157-2], Ex. A (under seal). As to the calculations, according to ADP, Halpin could have earned a 20% commission on implementation costs and up to a 10% commission on new sales, citing to the 2015-16 Sales Compensation Plan. ECF No. [157-2], Ex. A & B (under seal); *see also* [157-16] ¶¶ 65–67.

## II.    PROCEDURAL BACKGROUND AND RELATED MATTERS

ADP initially filed separate actions in Essex County Superior Court against Lynch and Halpin on February 8, 2016, and Defendants removed. ECF No. [1]. In the complaints, ADP alleges breaches of the non-compete, non-solicitation, and non-disclosure provisions found in the SRAs, RCAs, and NDAs; breach of the duty of loyalty; and unfair competition. *See* ECF No. [1-1]; *see also* Case No. 16-cv-1111, ECF No. [1-1].

Defendants moved to dismiss or transfer, and ADP sought a preliminary injunction. ECF Nos. [8], [19]. On June 30, 2016, the Court granted in part and denied in part the motion to dismiss, denied the motion to transfer, and granted in part and denied in part the

motion for a preliminary injunction. ECF No. [30]. As to the injunction, the Court enjoined Defendants from (i) using or disclosing ADP's proprietary information, (ii) soliciting ADP's current clients, vendors, employees, or partners, and (iii) soliciting ADP's prospective clients only to the extent that Defendants gained knowledge of those prospective clients through their employment at ADP. *Id.* The Court denied ADP's request to enjoin Defendants from contacting prospective clients that Defendants did not learn of while working at ADP and from working at USG altogether. ECF No. [31]. After reconsideration was denied, ECF No. [51], Defendants appealed. On February 7, 2017, the Third Circuit affirmed the June 30, 2016 Opinion. ECF Nos. [64], [66-1].

Over the next two years, Defendants moved to vacate the injunction, and ADP sought sanctions for its alleged violations. The Court generally denied these motions but granted one of the sanctions motions against Halpin. ECF Nos. [84], [105], [121], [132].

Meanwhile, the parties filed the instant Motions. In their briefs, the parties informed the Court of thirteen cases in various procedural postures challenging the enforceability of the SRAs and RCAs. These included three cases on appeal at the Third Circuit and six cases on appeal at New Jersey's Appellate Division. *See ADP, LLC v. Rafferty* (18-1796) *consolidated with ADP, LLC v. Mork* (18-2603); *ADP, LLC v. Trueira* (18-2803); *ADP, LLC v. Kusins* (A-4664-16T1) *consolidated with ADP, LLC v. Hopper* (A-0692-17T3); *ADP, LLC v. Karamitas* (A-0693-17T3); *ADP, LLC v. LeNoble* (A-2990-17T4); *ADP, LLC v. DeMarco* (A-4407-17T4); *and ADP, LLC v. Hobaica* (A-4527-17T4). The Court stayed the Motions pending resolution of the appeals. ECF Nos. [165], [166].

In that Order, the Court further instructed ADP to show cause why, after nearly three years, the preliminary injunction should not be lifted since the restrictive covenants were contractually limited to one year. *Id.* At oral argument, ADP conceded that the injunction should be lifted as to Lynch but contested lifting as to Halpin. By way of written opinion, the Court lifted the injunction, finding that, even assuming the enforceability of the RCAs and their tolling provisions, the record reflected no alleged violations of the restrictive covenants enforced under the injunction by either Defendant for one year such that "ADP has received the benefit of its bargain as to the one-year restrictive covenants and there is nothing left for the Court to enforce or enjoin." ECF No. [173] at 5.

On April 26, 2019, Third Circuit issued an opinion in the *Rafferty* and *Mork* appeals, and after Defendants' petition for rehearing *en banc* was denied, ECF No. [178], the mandate issued on June 4, 2019. *Rafferty*, 923 F.3d at 113. On July 25, 2019, in the *Trueira* appeal, the Third Circuit vacated and remanded for further proceedings consistent with *Rafferty*. *ADP, LLC v. Trueira* (Case No. 18-2803). The following day, the Appellate Division issued a decision in the consolidated New Jersey state appeals. *ADP, LLC v. Kusins*, No. A-0692-17T3, 2019 WL 3367212 (N.J. Super. Ct. App. Div. July 26, 2019).

Although the Court invited the parties to submit supplemental briefing based on these decisions, the parties declined to do so. ECF No. [176]. Instead, the parties submitted letters to the Court explaining their views on the opinions. ECF Nos. [178], [179], [180].

On August 20, 2019, Defendants filed letter informing the Court that the six defendants in *Kusins* had filed a Petition for Certification to the New Jersey Supreme Court. ECF No. [182]. On January 23, 2020, Plaintiff informed the Court that the New Jersey Supreme Court denied defendants' petition for certification in *Kusins*. ECF No. [185]. The Court finds further stay unwarranted and turns to the Motions.

## III.   THE INSTANT MOTIONS

### A. ADP'S MOTIONS FOR SUMMARY JUDGMENT

ADP moves for summary judgment against Defendants. While the contours of the alleged violations are fact-specific, the arguments made in favor of and opposition to ADP's motions are nearly identical as to each Defendant and the Court summarizes them together. *Cf.* ECF Nos. [150-3], [151-3]. ADP makes two sets of arguments. First, it argues that as a matter of law, the SRAs and RCAs are enforceable under against both Defendants. ECF Nos. [150-3] at 10–27, [151-3] at 12–29. However, because ADP moved for summary judgment prior to the *Rafferty* and *Kusins* decisions (and declined to provide supplemental briefing), ADP does not address the import of these decisions in its motion which render some of the arguments made no longer consistent with applicable precedent.

Second, ADP argues there is no genuine issue of material fact regarding Defendants' acceptance of the SRAs and RCAs and their breach of the agreements' non-compete provision—by working at USG in a similar position and territory during the one year non-compete period—and non-solicitation provision—by contacting certain ADP employees, clients, or prospective clients. ECF Nos. [150-3] at 7, 9, 27–28, [151-3] at 12, 29-30.

ADP also argues there is no dispute that Defendants breached the non-disclosure provision found in the SRAs and RCAs because it is "impossible for [Defendants] to perform [their] duties to USG without using that information to both [their] and USG's advantage, and to ADP's substantial competitive disadvantage." ECF Nos. [150-3] at 27–29, [151-3] at 30–31. ADP separately argues Defendants breached the duty of loyalty by "gain[ing] knowledge of extensive confidential information belonging to ADP that he has used and inevitably will continue to use at USG . . ." and engaged in unfair competition by misappropriating this information. ECF Nos. [150-3] at 29–30, [151-3] at 31–32.

As to the requested remedies, ADP seeks a permanent injunction prohibiting Defendants for one year from: (1) working at an ADP competitor in a substantially similar position in the same territory that they worked in during the two-year period before their employment ended, (2) soliciting ADP's clients, vendors, referral sources and marketing partners; (3) soliciting ADP's prospective clients which Defendants learned of while employed by ADP; (4) soliciting ADP's employees to leave their employment with ADP; (5) disclosing ADP's confidential and trade secret information. *See* ECF Nos. [150-3],

[151-3]. ADP also seeks summary judgment on Defendants' counterclaims for unpaid commission and requests further briefing on damages and attorneys' fees. *Id.*

In largely identical briefs, Defendants oppose, arguing that "the Court should find ADP's restrictive covenant agreements to be restraints of trade, unreasonably overbroad, and unenforceable as written." ECF No. [154], [155] at 1. Defendants argue that, should the Court find the RCAs unenforceable, it should find them completely unenforceable and decline to "blue pencil" them. ECF Nos. [154] at 23, [155] at 24. Defendants also argue that ADP has not introduced any evidence to demonstrate that Defendants misappropriated any confidential information. *Id.* Like ADP, because Defendants opposed summary judgment prior to the *Rafferty* and *Kusins* decisions (and declined to provide supplemental briefing), they do not address the import of these decisions in their brief which render some of the arguments made no longer consistent with applicable precedent.

Defendants next argue that summary judgment should be granted in their favor because ADP has failed to present evidence of damages. Defendants further state that ADP's request to later brief damages is an improper attempt to bifurcate summary judgment. ECF Nos. [154], [155]. ADP's reply generally reiterated its opening arguments. ECF No. [160]. ADP did not address Defendants' arguments regarding damages.

## B. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

In nearly identical briefs, Defendants separately move for summary judgment in which they largely repeat their arguments in opposition to ADP's motions. Like ADP's motions, their arguments can be divided into two general categories: arguments relating to the law applicable to restrictive covenants and arguments asserting that Defendants' conduct does not amount to the breaches as ADP alleges. ECF Nos. [148-2], [149-2].

First, Defendants argue that ADP is collaterally estopped from enforcing the RCAs, that the RCAs amount to unenforceable restrains of trade, and that the terms of the RCAs are unreasonable rendering them wholly unenforceable. ECF Nos. [148-2] at 9–24, [149-2] at 10–25. Second, Defendants argue that ADP has not pointed to evidence in the record that Defendants violated a "reasonable' non-solicitation provision nor revealed or misappropriated any confidential information. ECF Nos. [148-2] at 24–27, [149-2] at 25–28. Defendants state that the breach of loyalty and unfair competition claims must also fail since there is no evidence in the record that Defendants misappropriated any confidential information. ECF Nos. [148-2] at 27, [149-2] at 28. Defendants also argue that ADP has failed to submit evidence of damages. *Id.* Finally, Defendants argue that for summary judgment on their counterclaims. ECF Nos. [148-2] at 27–28, [149-2] at 29–30.

In opposition, ADP refutes these arguments and, for the most part, repeats its points in favor of summary judgment. *See* ECF Nos. [156], [157]. In response to Defendants' argument on damages, ADP submits the expert report of Robert L. Vigil which calculates damages related to Defendants' alleged breaches. ECF Nos. [156-6], [157-11] (under seal). On reply, Defendants reiterate their arguments regarding the applicable law, the lack of damages, and their entitlement to summary judgment. ECF Nos. [158], [159].

## IV.    LEGAL STANDARD

"Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Azur v. Chase Bank, USA, Nat. Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010) (citing *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000). "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Id.* (citing *Ridgewood Bd. of Educ. v. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999)). Thus, a disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a fact to be considered "material," it must have the potential to alter the outcome of the case under the governing law. *Id.* The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To resist summary judgment, a party may not rely on solely unsupported conclusions or denials, but rather must go beyond the pleadings and affidavits and designate for the Court specific facts showing that there is a genuine issue for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 181 (3d Cir. 2009) (quotation marks omitted)). However, when the nonmovant's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court does not take those facts as true. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The same standards and burdens apply on cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). When confronted with cross-motions for summary judgment, the court must rule separately on each party's motion. *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006) (citations omitted). If the cross-motions reveal no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

## V.    ANALYSIS

### A. RESTRICTIVE COVENANTS UNDER NEW JERSEY LAW

As the Third Circuit recently observed, "New Jersey has evolved from invalidating overbroad restrictive covenants outright to presumptively compressing or reducing their scope so as to render the covenants reasonable." *ADP, LLC v. Rafferty*, 923 F.3d 113, 120 (3d Cir. 2019) (quoting *Karlin v. Weinberg*, 77 N.J. 408, 420 n.4 (1978)). This rule of partial enforcement—or "blue-penciling"—seeks to "to fulfill a restrictive covenant's

lawful objectives while nevertheless ensuring that such agreements do not unreasonably hinder competition or employee mobility." *Id.* (citing *Maw v. Adv. Clinical Commc'ns, Inc.*, 179 N.J. 439, 447 (2004)). In reviewing these covenants, the court must balance three concerns: (1) protecting legitimate business interests, (2) undue burden an employee, and (3) the public interest. *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 584 (1970). Under the blue-penciling approach, while a restrictive covenant that is "deliberately unreasonable and oppressive" should be found to be *per se* unenforceable, courts should partially enforce an overbroad covenant and rarely invalidate a restrictive covenant as long as such partial enforcement comports with *Solari*. *Id.* at 578–79; *see also Rafferty*, 923 F.3d at 121.

A restrictive covenant may properly protect legitimate business interests such as trade secrets, confidential information, and preservation or cultivation of customer relationships. *Rafferty*, 923 F.3d at 121 (citing *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25 (N.J. 1971); *A. T. Hudson & Co., Inc. v. Donovan*, 216 N.J. Super. 426, 433–34 (Ct. App. Div. 1987)). However, an "employer has no legitimate interest in preventing competition as such or simply prohibiting an employee from exercising her general knowledge within the industry." *Rafferty*, 923 F.3d at 121 (quoting *Whitmyer*, 58 N.J. at 25).

"Courts will not enforce a restrictive agreement merely to aid the employer in extinguishing competition," even if such competition is from a former employee. *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 635 (1988). "Indeed, the 'knowledge, skill, expertise, and information acquired by an employee during his employment become part of the employee's person,' and the employee may 'use those skills in any business or profession he may choose, including a competitive business with his former employer.' " *ADP, LLC v. Kusins*, No. A-0692-17T3, 2019 WL 3367212, at *14 (N.J. Super. Ct. App. Div. July 26, 2019) (quoting *Ingersoll-Rand*, 110 N.J. at 635).

To determine if a restrictive covenant places undue hardship on an employee, the court considers "the likelihood of the employee finding other work in his or her field and the burden the restriction places on the employee." *Kusins*, 2019 WL 3367212, at *15 (quoting *Cmty. Hosp. Grp., Inc. v. More*, 183 N.J. 36, 59 (2005)). The court may also consider whether the employee voluntarily left his employment and thus "put [himself] in the position of bringing the restriction into play." *Id.* at *17 (quoting *More*, 183 N.J. at 59). However, the undue hardship factor rarely weighs in favor of complete invalidation of a restrictive covenant and often counsels towards blue-penciling. *Rafferty*, 923 F.3d at 122 (citations omitted). Blue-penciling may include modifying the geographic, temporal, and subject matter restrictions so that they do no more than "reasonably necessary to protect the employer's legitimate business interests." *Kusins*, 2019 WL 3367212, at *15 (quoting *Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477, 489 (D.N.J. 1999)). Under the public interest factor, New Jersey recognizes two instances where invalidation is appropriate: restrictive covenants for psychologists and for lawyers. *More*, 183 N.J. 36, 54–55.

## B. THE APPELLATE COURTS' ANALYSIS OF THE RCAS

Analyzing the more restrictive RCAs signed only by high-performing employees, the Third Circuit found ADP "has a legitimate business interest in imposing the RCA on

this subset of employees, and the RCA's heightened restrictive covenants . . . are reflective of the greater damage those employees could inflict on ADP upon their departure" based on their exposure to confidential information, extensive client relationships, or both. *Rafferty*, 923 F.3d at 123. The Circuit found that the RCAs "are not unenforceable in their entirety because they serve a legitimate business interest, but they may place an undue hardship on employees because they are overbroad." *Id.* at 116.

Turning to the second and third *Solari* factors to determine if blue-penciling was required, the Circuit acknowledged that the "RCA would impose some level of hardship on former ADP employees who want to market themselves in the same field in which they have previously worked," but declined to reach the question of blue-penciling. The Circuit instead remanded for further consideration by the district court. *Id.* at 126–27.

Building upon the Circuit's analysis, three months later the New Jersey Appellate Division issued its decision in the six related consolidated cases. *Kusins*, 2019 WL 3367212, at *1. As did the Circuit, the Appellate Division found the RCAs were not unenforceable because they protected a legitimate business interest. *Id.* at *15. The Appellate Division found under the second and third factors that the non-solicitation and non-compete provisions were "overly broad and require blue-penciling to ensure they reasonably guard ADP's interest in protecting its customer relationships without imposing an undue hardship on its former employees." *Id.* at *1 (footnote omitted). The Court blue-penciled the RCAs as follows:

> [The] non-solicitation clause and non-compete clause may prevent an employee from having any dealings with existing ADP clients that the employee was actively involved with or whose names the employee learned during his or her employment. . . . [The] clause pertaining to prospective clients may only be enforced against a former employee who gained knowledge of a potential client while at ADP and directly or indirectly solicits that client after leaving and working for a competitor.

*Id.* at *17. Specific to the non-compete, the Appellate Division held "it [is] reasonable for ADP to restrict its former employees, for a reasonable time, from providing services to a competing business in the same geographical territory in which the employee operated while at ADP." *Id.* at *1.

For the breach of the duty of loyalty and unfair competition claims, the Appellate Division affirmed summary judgment and declined ADP's invitation to hold that "[defendants'] knowledge of ADP's confidential information, gleaned while employed at ADP, should be enough to establish a breach of loyalty" and unfair competition. *Id.* at *21. The Appellate Division further noted that "the general knowledge gained by defendants while employed at ADP is not a protectable business interest and, without demonstrating that they improperly used that information, ADP is unable to establish" either claim. *Id.*

### C. APPLICATION[2]

#### a. Relationship Between the SRA and RCA

The parties set forth arguments under both the SRAs and RCAs.[3]  Thus, as a preliminary matter the Court must determine which agreement, or both, applies to this dispute.  The parties agree Defendants signed the SRA when they were each hired in 2009.  The parties further agree Defendants signed the RCAs, beginning in 2011 or 2012 through 2015.  There is no dispute the RCAs contain broader protections than those in the SRAs.

The most recent RCA states as follows:

> **13. Entire Agreement and Validity of Terms.** . . . I understand that I may have an existing agreement(s) with ADP . . . that may include the same or similar covenants as those in this Agreement, and acknowledge that this Agreement is meant to supplement any such agreement(s) such that the covenants in the agreements that provide ADP with the greatest protection enforceable under applicable law shall control . . . .

Based on this provision, the 2015 RCA supplements any prior agreements, and the 2015 RCA controls.  The Court limits its analysis to the terms of the 2015 RCA.

#### b. The Non-Compete Provision

Because of the close treatment of two appellate courts regarding the exact contracts at issue here, the Court is uniquely guided in its analysis.  The non-compete states as follows:

> **3. Non-Competition.** I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, own, manage, operate, join, control, finance, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require me to . . . provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed . . . .

ECF Nos. [148-4] at 75, [149-4] at 61.  A "Competing Business" is "any . . . entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of ADP for that part of the business in which I have

---

[2] The parties include arguments in the Motions that conflict with the holdings *Rafferty* and *Kusins* or mooted by their holdings.  Accordingly, the Court need not address these arguments.  *See generally*, ECF Nos. [148-2], [149-2], [158], [159], [160].

[3] Defendants also reiterate that they cannot be bound by the RCAs because they did not read them.  However, this Court has already found—and the Third Circuit affirmed—that "click wrap" agreements are enforceable, and there is no dispute that Defendants "clicked through" to accept the RCAs.  ECF Nos. [30], [51]; *see also ADP, LLC v. Lynch*, 678 F. App'x 77, 80 (3d Cir. 2017).

worked or to which I have been exposed during my employment with ADP . . . " ECF Nos. [148-4] at 74, [149-4] at 60. "Territory" is defined as the geographic area where Defendants worked at ADP for the two years prior to their resignation. *Id.*

Analyzing this provision, the Appellate Division found "it reasonable for ADP to restrict its former employees, for a reasonable time, from providing services to a competing business in the same geographical territory in which the employee operated while at ADP." *Kusins*, 2019 WL 3367212, at *1. The Appellate Division then blue-penciled the non-compete accordingly. This analysis is consistent with New Jersey law which routinely approves of non-competes restricted to a particular geographic area for one year. *Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274, 299 (Law. Div. 1995).

Here, ADP seeks to prohibit Defendants from selling in their former assigned territory at ADP, namely central Denver, Colorado and southeast Michigan, for one year. ECF Nos. [150-3] at 17, 33, [151-3] at 19, 35. The Court agrees with the Appellate Division that ADP may protect its business interests in its client relationships through a non-compete restricted to Defendants' prior territory and limited to one year. The Court finds the RCAs are not *per se* overbroad.

Defendants argue in opposition that ADP is impermissibly attempting to enforce the RCAs in an area larger than Defendants' ADP territory. Even if ADP has previously sought to enforce the non-compete in a larger territory, ADP explicitly concedes in its Motions that it seeks to enforce the non-compete only in Defendants' prior territory. Because ADP no longer seeks the relief to which Defendants object, this argument is unpersuasive.

Defendants next argue that the non-compete is unenforceable because it is not limited to cover only the same size businesses that Defendants' were assigned at ADP. However, this argument falls equally flat. The Appellate Division has considered—and rejected—this argument, and the Court finds the *Kusins* analysis instructive. *Id.* at *1. In *Kusins*, the Appellate Division found the trial courts' blue-penciling of the RCA's non-compete to limit enforcement to the employee's ADP territory *and* market segment unsupported by the record because "[t]he customer relationships ADP seeks to protect are the same, regardless of how many employees the client might have." *Id.* at *17. The Court finds the same reasoning applies here. ADP may protect its legitimate business interests— namely its client relationships—by imposing a one-year geographically limited non-compete, even if it is not limited to the market segment to which Defendants' were assigned while at ADP.[4]

As to the hardship and public policy factors, Defendants both voluntarily left their positions at ADP, have not articulated any particular hardship related to the one-year geographic limitation, and there is no evidence in the record that the non-compete prevents

---

[4] At the preliminary injunction, the Court did not enjoin Defendants from working at USG. ECF No. [30] at 13. With the limited record at that stage, ADP had not met its burden to demonstrate a likelihood of success on the merits for breach of the non-compete. *Id.* Moreover, ADP sought to enjoin Halpin from working in all of Michigan, not just his prior ADP area. ECF No. [20-3].

them from working all together. *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322 (2008); *Trico Equip., Inc. v. Manor*, No. CIV.08-5561(RBK), 2009 WL 1687391, at *8 (D.N.J. June 15, 2009); *More*, 183 N.J. at 59.

Finally, the non-compete is not unreasonably injurious to the public. *A.T. Hudson & Co. v. Donovan*, 216 N.J. Super. 426, 432 (App. Div. 1987). The record does not reflect any facts that would suggest that the non-compete has harmed the public's access to the services that ADP provides, and in fact demonstrates that the industry is highly competitive and requires significant investment in client cultivation. Neither of these considerations tips the balance in favor of finding the non-compete unenforceable.

Having found the non-compete enforceable, even taking the facts in the light most favorable to Defendants, ADP has demonstrated there is no genuine issue of material fact as to whether Defendants breached the non-compete provisions of the RCAs. The record reflects that USG and ADP compete for the same or similar business. It is undisputed that Defendants' USG work is substantially similar to their work at ADP. While the exact zip codes that ADP assigned Defendants are not clear from the record, the parties agree that each was assigned zip codes which constituted their "territory" under the RCAs. The parties further agree that Defendants work at USG in at least some areas that overlap with their assigned territory at ADP. And finally, Defendants have not pointed to evidence in the record to raise an issue of fact for trial on breach of the non-compete. Accordingly, summary judgment will be **GRANTED** in favor of ADP as to the non-compete. For the same reasons, Defendants' cross-motions for summary judgment as to the non-compete provision will be **DENIED**.

## D. THE NON-SOLICITATION OF CLIENTS PROVISION

### a. Solicitation of Prospective Clients

Under the RCA's prospective client non-solicitation provision, Defendants agreed that they would not directly or indirectly solicit, divert, or accept business from any prospective client of ADP—or attempt to do so. ECF Nos. [148-4] at 75, [149-4] at 61. "Prospective" clients are any business which ADP unsuccessfully solicited in the last two years worldwide, as well as any business worldwide that ADP reasonably expects it might solicit within two years of the employee's resignation date. *Id.*

The Third Circuit, the Appellate Division, and this Court have all previously found that this provision is likely, or actually, unenforceable as written. ADP's corporate representative testified that, given ADP's reach, essentially all companies that are not current clients are considered "prospective" clients. ECF No. [149-6], Wohlfeil Tr. at 43. Thus, the provision seeks to prevent a former employee from soliciting any "prospective" clients of ADP—that is, any business worldwide that is not already an ADP client— whether or not that employee worked on that account or learned of the prospect at ADP. On summary judgment, however, ADP concedes that the provision as written is over broad and seeks to enforce a blue-penciled version as to only prospective clients that Defendants gained knowledge of while working at ADP. ECF No. [151-3] at 1, 15 n.3; [160] at 4 n.3.

The Court agrees with ADP and the Appellate Division that the non-solicitation provision must be blue-penciled to only prohibit solicitation of prospective clients that the employee gained knowledge of while at ADP. The RCA's attempt to limit a former employee from soliciting any "prospective" ADP client amounts to nearly prohibition from working at all, since ADP claims that any business is a "prospect" so long as it is not using ADP's services. *See* ECF No. [149-6], Wohlfeil Tr., at 43, 150. By blue-penciling the provision to only restrict solicitation of prospective clients that Defendants gained knowledge of at ADP, the Court balances ADP's legitimate business interest in those client relationships that Defendants learned of or cultivated while at ADP, while not unduly burdening Defendants' ability to work. *Kusins*, 2019 WL 3367212, at *15.

Applying this blue-penciled non-solicitation provision, the undisputed facts demonstrate that Halpin contacted two prospective clients that he had learned about while at ADP: Alta and McNaughten McKay. Halpin concedes that he gained knowledge of both clients while working at ADP and that he contacted each at least once while working at USG. ECF Nos. ECF Nos. [149-1], [157-16] ¶¶ 48–49, 50–52; [151-2], [155-1] ¶¶ 44–45. For all other prospective clients identified by ADP in its Motion, ADP has not pointed the Court to facts that demonstrate Halpin learned of the client while at ADP. Thus ADP has not met its burden on summary judgment. According ADP's motion for summary judgment will be **GRANTED** as to the breach of the non-solicitation provision as to Alta and McNaughten McKay and **DENIED** as to the remaining prospective clients.

Halpin also moves for summary judgment on the non-solicitation provision, arguing that it is undisputed that Halpin testified that he never learned of prospective clients Kuka, Oakland Management, Green Village, Dickerson, Little River Casino, HR Vision IT while working at ADP. ADP has failed introduce evidence to the contrary, and instead notes either that it agrees it has not introduced such evidence or that "ADP has no way of knowing whether [Halpin's] testimony is factually accurate." *See* ECF No. [157-16]. Such statements are insufficient to resist summary judgment, and Halpin's motion for summary judgment will be **GRANTED** as to the breach of the non-solicitation provision for prospective clients Kuka, Oakland Management, Green Village, Dickerson, Little River Casino, HR Vision IT. As to PACE, Halpin testified that he had no contact with PACE after he resigned, and ADP has not pointed the Court to facts that would show that Halpin solicited PACE in violation of the RCA after he left ADP. ECF No. [149-4], Lynch Tr. at 210. Halpin's motion will be **GRANTED** as to PACE.

For Lynch, ADP points the Court to contact with one prospective client: Libertyfrac. The parties agree that Lynch learned of Libertyfrac while at ADP and, once at USG successfully sold Libertyfrac USG products. ECF Nos. [150-2], [154-1] ¶ 36. Applying the blue-penciled non-solicitation provision, even taking the facts in the light most favorable to Lynch, it is undisputed that Lynch violated the non-solicitation provision when he successfully sold USG products to Libertyfrac. Accordingly, ADP's motion will be **GRANTED** and Lynch's motion will be **DENIED** as to Libertyfrac.

### b. Solicitation of Current ADP Clients and Business Partners

For current ADP clients and partners, ADP urges that the Court find that Defendants violated the non-solicitation provision by soliciting any ADP client or partner, whether they learned the entity is an ADP client at ADP, during a USG sales process, or never at all. ECF No. [151-3] at 20. ADP argues in the alternative that the provision be blue-penciled to apply only when Defendants learn a business is ADP's client, since under such blue-penciling "[a]ll [that is] require[d] is the non-burdensome act of asking a prospect whether it is a current ADP client." *Id.* The Court addresses each argument in turn.

First, the guidance from the Appellate Division and the record before the Court demonstrate that enforcement of the non-solicitation provision for all current ADP clients or partners exacts too much of a burden on Defendants. First, ADP has approximately 700,000 clients worldwide and an unknown number of partners. Restricting solicitation of hundreds of thousands of entities—known and unknown to Defendants—places an undue burden an employee seeking to leave ADP, even when limited to one year.

ADP's alternative suggestion that the provision be blue-penciled to cover current clients that Defendants know or later become aware are ADP clients cannot pass muster under *Solari* given the facts before the Court. Under this view, Defendants must affirmatively inquire before engaging with a prospect whether that entity is currently using any ADP services. *See* ECF No. [160] at 5–6. Relying on *Mailman, Ross, Toyes & Shapiro v. Edelson*, 183 N.J. Super. 434, 444 (Ch. Div. 1982) (*disagreed with on other grounds by Schuhalter v. Salerno*, 279 N.J. Super. 504, 509 (App. Div. 1995)), a case regarding an accountant's non-compete, ADP argues that it is not burdensome to require Defendants to first inquire if the client uses ADP before soliciting them. *See* ECF No. [160] at 5-6.

But both Defendants testified that, while sometimes they have information regarding a potential client's current vendor through their client database, internal USG communications, or other due diligence, that information is often incorrect or incomplete. ECF Nos. [149-4], Halpin Tr. at 192–95, 201. Defendants also testified that, as part of their sales process, they sometimes initially inquire about what system a potential client uses, but sometimes not. According to Defendants, a potential client's complaints regarding their current systems may suggests what vendors a prospect uses, and in other instances the prospect will reveal its current vendors.

Based on the facts before the Court, ADP's request that the non-solicitation provision be blue-penciled to cover only prospects that Defendants know or become aware are ADP clients creates undue hardship on Defendants. To comply with the moving goal posts of permissible businesses to solicit based on their own evolving knowledge, Defendants must amend their sales processes to inquire about a prospect's vendors or be incentivized to remain in the dark, lest Defendants discover the prospect is a client of ADP. The unique contours of the sales process is sufficiently distinguishable from the analysis in *Mailman* and the Court finds its reasoning unpersuasive here. To enforce the non-solicitation provision in either way that ADP suggests, Defendants would be required to

change their sales and networking methodology, risk violating the provision with each sales contact, or not work at all. This places an undue hardship on Defendants.[5]

The non-solicitation provision is thus subject to blue-penciling. Finding the analysis of the Appellate Division well-reasoned and instructive, the Court blue-pencil the non-solicitation provision consistent with *Kusins* and limit its prohibitions to clients that Defendants gained knowledge of while working at ADP. *ADP, LLC v. Kusins*, 2019 WL 3367212, at *17. This blue-penciling is workable for both parties: ADP can protect its business interests in the client relationships it invested in through each Defendant, while Defendants are not prohibited from working, required to alter their professional practices, or risk violating the RCAs by performing their general job duties at USG.

With these principles in mind, the Court turns to the solicitations set forth by the parties on the Motions. As to Halpin, the only client that the undisputed facts demonstrate that Halpin gained knowledge of at ADP and later solicited at USG is Horizon Global. Despite some of Halpin's testimony to the contrary, the parties agree that Halpin worked on the Horizon Global account and received a 25% commission for that work while at ADP. The parties further agree that he solicited Horizon Global at USG. Accordingly, ADP's motion will be **GRANTED** as to the breach of the non-solicitation provision for Horizon Global and **DENIED** for the remaining ADP clients because record does not demonstrate that Halpin gained knowledge of those clients while working at ADP.

Halpin also moves for summary judgment on the non-solicitation provision, arguing that the record demonstrates that Halpin never knew of each of the remaining ADP clients while working at ADP. The Court agrees, and Halpin's motion will be **GRANTED** as to the breach of the non-solicitation clause for ADP clients Motus, United Shore Financial, Hastings Mutual, Plasan Carbon, Padnos, Shinola, Asahi Kasei Plastics, Work Skills, Barfly Ventures, and NGK Spark Plug. Halpin has introduced evidence that he did not learn of any of these clients while at ADP, and ADP has not introduced evidence to create a genuine issue of material fact to defeat summary judgment as to these clients.

Turning to Defendant Lynch, the parties cross move for summary judgment on ADP's claims that Lynch solicited ADP clients RE/MAX, Corden Pharmaceuticals, Frasier Meadows, and Jonah Energy, as well as ADP business partner IMA. As to RE/MAX, Corden, and Frasier, ADP has not introduced any evidence that Lynch knew of these clients at ADP, and Lynch's direct supervisor at ADP testified that "not to his knowledge" had Lynch any contact with RE/MAX and Corden, and appears to not have been asked about contact with Frasier. ECF No. [148-4], Turman Tr. at 91–92. Moreover, Lynch testified he did not learn of any of these companies through ADP. ECF No. [148-4], Lynch Tr., at 115–16, 12. Accordingly taking the facts in the light most favorable to the non-movant,

---

[5] With the benefit of the full record, the Court may appropriately tailor its findings to narrow the enforceability of the RCAs from its initial findings at the preliminary injunction stage. *ADP, LLC v. Lynch*, 678 F. App'x 77, 80 (3d Cir. 2017).

ADP's Motion will be **DENIED** as to RE/MAX, Corden, and Frasier, and Lynch's motion will be **GRANTED** as to these three clients.

The parties agree that Lynch learned of ADP client Jonah Energy and ADP marketing partner IMA while he was employed at ADP. The undisputed facts demonstrate that after Lynch left ADP, he solicited Jonah Energy via email. *See* ECF No. [150], Ex. 38. As to IMA, Lynch disputes that his email to IMA constituted a "solicitation" and argues that he "had written to [his IMA contact] to merely let him know that he could no longer reach Lynch the way he had done in the past." *Cf.* ECF No. [154-1] ¶ 34 *with* [150], Lynch Tr. Ex. 15.[6] In the email, Lynch, after informing IMA of his move to USG, states "I am confident that this charge will enable me to continue to be a resource to IMA but without the poor service of ADP," and then invites his IMA contact to meet for coffee. No reasonable jury could find that, at a minimum, this email does not constitute "directly or indirectly engag[ing] or attempt[ing] to engage" an ADP business partner. ECF No. [148-4] at 75. Accordingly, ADP's motion as to Jonah Energy and IMA will be **GRANTED**. and Lynch's motion as to Jonah Energy and IMA will be **DENIED**.

### E. THE NON-SOLICITATION OF EMPLOYEES PROVISION

ADP argues that Lynch breached the non-solicitation of employees provision when he mentioned former ADP employee Dan Hobaica to USG. Under the RCA, Lynch agreed he would not "directly or indirectly, hire, solicit, recruit, or encourage to leave ADP, any current employees of ADP...." ECF No. [148-4] at 76. Lynch disputes he supplied Hobaica's name for recruitment but testified as follows:

> Q: ... [s]ince you started working at Ultimate, have you suggested to Ultimate that they contact any ADP employees to consider them for jobs?
>
> A: There was one situation where I did.
>
> Q. Okay. Who did you suggest Ultimate contact?
>
> A. Dan Hobaica.
>
> ...
>
> Q. So why did you suggest to Ultimate that he—that they contact Mr. Hobaica?
>
> A. He had worked at ADP a similar amount of time as me and someone asked if I knew anyone that would be a good fit for Ultimate . . . .

ECF No. [150-1], Lynch Tr. at 124. Hobaica eventually left ADP for USG. The record reflects that Lynch knew Hobaica was an ADP employee and at least indirectly recruited Hobaica in violation of the RCA. ADP's motion will be **GRANTED** as to the solicitation of Hobaica and Lynch's motion for will be **DENIED**.

---

[6] Lynch does not argue that IMA is not a "Business Partner" under the RCA, and the Court according considers this issue undisputed. *See* L.R. 56.1.

### F. THE NON-DISCLOSURE PROVISION AND ADP'S CLAIMS FOR BREACH OF CONTRACT, BRECH OF THE DUTY OF LOYALTY AND UNFAIR COMPETITION

ADP moves for summary judgment on the non-disclosure provisions of the RCA, arguing that by virtue of working at USG Halpin and Lynch have breached their non-disclosure agreements.  According to ADP, because Defendants learned about ADP's products, sales practices, and pricing, it would be "impossible for [Halpin and Lynch] to perform [their] during to USG without using that [confidential] information."  *See* ECF Nos. [150-3] at 29–30, [151-3] at 31–32, [156] at 16, [157] at 15.  ADP does not identify any specific information which was disclosed, but instead argues that Defendants necessarily must "us[e] ADP's confidential information when [they] solicit potential customers for USG."  *Id.*  Defendants challenge this reading of the RCA's non-disclosure provision as overbroad and unenforceable.

The Appellate Division has rejected ADP's argument, and so does this Court.  New Jersey law recognizes that an employer does not have a legitimate interest in preventing an employee from working at a competitor simply because such work would necessarily entail the use of general understanding of the industry.  *Ingersoll-Rand Co.*, 110 N.J. at 635).  Rather, "the knowledge, skill, expertise, and information acquired by an employee during his employment become part of the employee's person," and the employee may "use those skills in any business or profession he may choose, including a competitive business with his former employer."  *Kusins*, 2019 WL 3367212, at *14 (quoting *Ingersoll-Rand Co.*, 110 N.J. at 635).  Here, the facts ADP identifies amount to no more than an attempt to curtail Defendants' use of their general industry knowledge at a competitor.  ADP's corporate representative testified that he could not pinpoint any particular information that he believes either defendant impermissibly took from ADP.  And evidence that Defendants worked at a competitor, without more, is insufficient to demonstrate a violation of the non-disclosure provision.

ADP's claims for breach of the duty of loyalty and unfair competition are similarly based on this theory, and thus similarly fail.  *See* ECF No. [151-3] at 31–32.  As to both, ADP argues that because Defendants worked at a competitor, they necessarily breached their duty of loyalty and engaged in unfair competition by misappropriating confidential information.  *Id.*  But ADP cannot prevail on its motion for summary judgment based on alleged "misappropriation" without identifying any misappropriated information.  As did the Appellate Division, the Court declines ADP's invitation to hold that Defendants "knowledge of ADP's confidential information, gleaned while employed at ADP, should be enough to establish a breach of loyalty" and unfair competition.  *Kusins*, 2019 WL 3367212, at *21.  Instead, "the general knowledge gained by defendants while employed at ADP is not a protectable business interest and, without demonstrating that they improperly used that information, ADP is unable to establish" either claim.  *Id.*  ADP's motion as to breach of the non-disclosure provision, unfair competition, and breach of the duty of loyalty will be **DENIED** and Defendants' motion will be **GRANTED**.

## G. REMEDIES

### a. Injunctive Relief

ADP argues that it is entitled to a permanent injunction.  ECF No. [151-3] at 34. However, on April 2, 2019—six months after ADP filed its Motions, the Court lifted the preliminary injunction noting that even given the tolling provision, "ADP has received the benefit of its bargain as to the one-year restrictive covenants and there is nothing left for the Court to enforce or enjoin." ECF No. [173] at 5.  Any permanent injunctive relief that ADP seeks covered in the preliminary injunction is **DENIED AS MOOT**.

However, the preliminary injunction did not enforce the one-year non-compete, a provision which the Court has now found enforceable given the full development of the record, the provision's geographic and time limitations, and the guidance from the Appellate Division.  Under the RCAs, the non-compete is tolled as follows:

> **12. Tolling.** The restricted time periods [] shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain. This tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants and a court has declined to enjoin such conduct or I have failed to comply with any such injunction.

ECF Nos. [148-4] at 77, [149-4] at 63.  This Court has already found the tolling provision enforceable, and Appellate Division implicitly sanctioned its application by remanding several of the consolidated *Kusins* cases for further consideration of the tolling provision. *See* ECF No. [30]; *Kusins*, 2019 WL 3367212, at *18–21.

It is undisputed that Defendants have both continued to work in their ADP regions at least in part since the beginning of this lawsuit, and the Court never enjoined them from doing so.  As to this provision, ADP argues it has never received the benefit of its bargain, and thus seeks a permanent injunction.

A plaintiff seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (citation omitted).

Here, the record is woefully inadequate to warrant imposition of a permanent injunction.  While the Court has observed that "[g]enerally, the loss of goodwill, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm," ECF No. [30], *ADP, LLC v. Lynch*, No. 2:16-01053 (WJM), 2016 WL 3574328, at *8 (D.N.J. June 30, 2016), *aff'd*, 678 F. App'x 77 (3d Cir. 2017), that observation at the preliminary injunction stage does

22

not absolve ADP of its burden for the permanent injunction that it seeks. ADP states in its brief conclusory fashion "ADP has demonstrated that it suffered (and will likely continue to suffer irreparable harm for which it [sic] there is no adequate remedy at law" without further elaboration beyond recitation of Defendants' conduct. And, while ADP does argue that the balance of interests support the relief it seeks, it makes little effort to point the Court to facts in the record to support its arguments. At this late stage in the litigation, this showing is insufficient. Accordingly, the issue of injunctive relief for violation of the non-compete will be **SET FOR EVIDENTIARY HEARING.**

### b. Damages

To prove a breach of contract under New Jersey law, "a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Red Roof Franchising, LLC v. Patel*, 564 F. App'x 685, 688 (3d Cir. 2014). "[A] party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." *Pickett v. Lloyd's*, 131 N.J. 457, 474 (1993). Such "compensatory damages are intended to compensate the injured party for loss caused by the breach by putting the injured party in as good a position as it would have been in had the performance been rendered as promised." *Murphy v. Implicito*, 392 N.J. Super. 245, 266 (App. Div. 2007) (citing *Donovan v. Bachstadt*, 91 N.J. 434, 444, (1982)).

While New Jersey law does not require absolute precision to grant summary judgment, it does place a burden on plaintiff to prove the amount of damages to a reasonable degree of certainty. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1176 (3d Cir. 1993). "[T]he general rule is that whenever there is a breach of contract, . . . the law ordinarily infers that damage ensued, and, in the absence of actual damages, the law vindicates the right by awarding nominal damages." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 45–46 (1984) (internal citations omitted). Thus, "[w]ithout evidence of actual damages, however, defendant can recover no more than nominal damages . . . ." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F. Supp. 2d 543, 568–69 (D.N.J. 2003).

ADP submits two expert reports each authored by Dr. Robert L. Vigil to show its damages related to the allegations that Defendants have "solicited ADP clients to transfer their business to [USG], in breach of [their] contractual obligations to ADP." *See* ECF Nos. [156-6] at 6; [157-11] at 7 (both under seal); *see also* ECF Nos. [156], [157] at 38.

For Halpin, Dr. Vigil calculates the present discounted value of projected profits for five ADP clients for the projected length of their engagement with ADP. ECF No. [157-11] at 1 (under seal). Of the five clients Dr. Vigil analyzed, only one survives summary judgment: Horizon Global. For this client, Dr. Vigil calculates present discounted value of ADP's projected profits from the day Halpin first made contact with Horizon on September 14, 2016 for a projected client relationship of 12.6 years using ADP's discount rate. *Id.* ¶¶ 9, 25. Each of these inputs were provided by ADP. Although Dr. Vigil calculated maximum, minimum, and linear growth scenarios for the four other clients, for Horizon he

only used linear analysis because of lack of historical data. *Id.* ¶ 10. Dr. Vigil states that the present value of ADP's projected profits from Horizon is $948,726. *Id.* ¶ 35 & Ex. 3.

For Lynch, Dr. Vigil calculates the present discounted value of projected profits only for RE/MAX based on a projected length of engagement of 4.8 years. ECF No. [156-6] at 1. However, ADP's claim related to RE/MAX does not survive summary judgment.

ADP does not submit any evidence of damages related to the breach of the non-compete or the non-solicitation provision of ADP's employees, nor does it submit any evidence of damages on any of the other clients for which it has moved for summary judgment. ADP requests without further explanation that it be "permit[ed] to submit evidence of its damages as a result of [Defendants'] conduct." *See* ECF No. [150-3] at 2.

Defendants object to ADP's damages calculations on two grounds. First, they argue that by failing to provide evidence of damages in its affirmative Motions, the Court should grant summary judgment in Defendants favor. ECF No. [148-2] at 26–27, [149-2] at 27–28. Defendants further argue that ADP's request to brief damages after summary judgment is an attempt to improperly bifurcate their Motion. ECF No. [154], [155] at 30. Second, Defendants argue that Dr. Vigil's methodology using the present discounted value of lost business is not a proper method for calculating damages. ECF No. [159] at 14. Rather, Defendants argue that ADP, to the extent it is entitled to damages at all, is only entitled to lost profits, minus any costs that have been avoided. Defendants do not specify what costs, if any, they believe ADP has avoided as a result of Defendants' breach. *Id.* at 14–15.

After nearly four years of litigation, ADP offers no explanation regarding why it was unable to submit a complete record as to damages for its claims. The Court has granted summary judgment in favor of ADP breach of the RCA's non-compete clause as to both Defendants. The Court has also granted summary judgment in favor of ADP as to Halpin's contacts with Alta, McNaughten-McKay, and Horizon Global, and Lynch's contacts with LibertyFrac, IMA, Jonah Energy, and former ADP employee Hobaica. But the Court has no evidence before it of the proposed damages from each of these breaches.

As to Horizon Global, Defendants have raised issues of fact as to Dr. Vigil's calculations and methodology. *U.S. Claims, Inc. v. Yehuda Smolar*, PC, 602 F. Supp. 2d 590, 604 (E.D. Pa. 2009) (granting summary judgment on breach of contract claim and setting damages for evidentiary hearing). Accordingly, the issue of damages **BE SET FOR EVIDENTIARY HEARING**. While the Court will not permit separate motion practice on when ADP never sought leave to bifurcate its initial motion, ADP will be permitted to present evidence related to damages for the breach of the non-competes; Halpin's contacts with Alta, McNaughten-McKay, and Horizon Global; and Lynch's contacts with LibertyFrac, IMA, Jonah Energy, and former ADP employee Hobaica.

## VI.   THE COUNTERCLAIMS FOR UNPAID COMMISSIONS

Halpin and Lynch argue that they are each due $138,000.00 and $28,888.00, respectively, in unpaid commissions. According to ADP, pursuant to the Sales Compensation Plan and Sales Incentive Compensation Policy, Defendants are no longer

entitled to those commissions because some of the sales never materialized or required additional sales work. *See* ECF No. [157-2], Ex. B & C (under seal). Defendants dispute ADP's assertions and calculations, citing to discrepancies between ADP's policies, what they characterize as "self-serving" affidavits, and missing documentation. *Cf.* ECF Nos. [148-2] at 27–28, [149-2] at 29, [150-3] at 7–9, 35, [151-3] at 37, [156] at 4, 39, [157] at 3, 5–6, 39[158] at 15, [159] at 15. Factual disputes further exist regarding what occurred after Defendants left ADP with the sales at issue, whether additional sales efforts were required, and what commissions rates Defendants may be entitled to on those sales. *Id.*; *also cf.* ECF Nos. [148-1], [156-9] ¶¶ 51–53; [150-2], [154-1] ¶¶ 48–49, 54–55; [149-1], [157-16] ¶ 61–62, 65–67; [151-2], [155-1] ¶ 70.

Although both ADP and Defendants move for summary judgment on the counterclaims, on reply Defendants concede that the dueling testimony of the parties creates a material issue of fact as to the commissions that cannot be disposed of at summary judgment. ECF Nos. [158], [159] at 15. The Court agrees. The parties' motions for summary judgment on the counterclaims will be **DENIED** and **SET FOR JURY TRIAL.**

### VII.   ATTORNEY'S FEES

ADP requests permission to file a motion for attorneys' fees. ECF Nos. [151-3] at 37, [150-3] at 36. Under the RCAs, the parties agreed that "if ADP substantially prevails in any litigation arising out of or relating to this Agreement ADP shall be entitled to recovery of its reasonable attorneys' fees and associated costs . . . ." ECF No. [148-4] at 77, [149-4] at 63. Because this matter will be set for evidentiary hearings and trial, a motion for attorneys' fees based on whether ADP has "substantially prevail[ed]" is premature and will be **DENIED WITHOUT PREJUDICE.**

### VIII.   CONCLUSION

For the reasons set forth above, the Motions are **GRANTED IN PART**, **DENIED IN PART,** and **SET FOR EVIDENTIARY HEARING IN PART.** An appropriate order follows.

WILLIAM J. MARTINI, U.S.D.J.

Dated: April 21, 2020

25